UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WANDA JEAN WILSON,

               Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

             Defendant.

_____

DECISION & ORDER

13-CV-6286P

## PRELIMINARY STATEMENT

Plaintiff Wanda Jean Wilson ("Wilson") brings this action *pro se* pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 16).

Currently before the Court is the government's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket # 12). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.       Procedural Background

Wilson applied for SSI/DIB alleging disability beginning on May 30, 2007, due to degenerative disc disease with radiating hip pain, migraines, blackouts, diabetes, hypoactive thyroid, high blood pressure, tuberculosis, depression, bipolar and homicidal.  (Tr. 222-23).[1]  On April 13, 2010, the Social Security Administration denied Wilson's claims for benefits, finding that she was not disabled.[2]  (Tr. 92-94).  Wilson requested and was granted a hearing before Administrative Law Barry E. Ryan (the "ALJ").  (Tr. 123-24, 166-70).  The ALJ conducted a hearing on May 12, 2011.  (Tr. 65-91).  Wilson was represented at the hearing by her attorney, John Bush, Esq.  (Tr. 65, 114).  In a decision dated June 20, 2011, the ALJ found that Wilson was not disabled and was not entitled to benefits.  (Tr. 10-30).

On March 25, 2013, the Appeals Council denied Wilson's request for review of the ALJ's decision.  (Tr. 1-4).  Wilson commenced this action on April 25, 2013 seeking review of the Commissioner's decision.  (Docket # 1).

### III.      Relevant Medical Evidence[3]

#### A.       Physical Health Treatment Records

##### 1.       Family Health Center

Treatment records from Family Health Center, located in Florida, indicate that Wilson received treatment between July 2006 and October 2009.  (Tr. 342-95).  Wilson was seen by Christine Mackie ("Mackie"), MD, on July 1, 2006 complaining of back pain.  (Tr. 394-95).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Wilson previously applied for and was denied benefits after a hearing by a different administrative law judge on December 12, 2008.  (Tr. 95-109).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

2

According to Wilson, the pain radiated down the front of her left leg to her knee. (*Id.*). Upon examination, Mackie observed that Wilson's lumbosacral spine exhibited abnormalities and that there was pain to palpation on the left side. (*Id.*). Mackie prescribed Lortab, Flexeril and Augmentin, and advised Wilson to return in one week if her symptoms did not improve. (*Id.*).

In April 2008, Wilson returned to the Family Health Center for treatment and was diagnosed with hypertension, obesity, diabetes mellitus, neurologic disorder, psychiatric disorders and anemia. (Tr. 391). In September 2008, Wilson attended another appointment complaining of pain in her legs and dizziness. (Tr. 378-82). In December 2008, Wilson arrived at the Family Health Center without an appointment complaining of pain in her back and legs. (Tr. 375). Her physician, Ida J. Gagliardi ("Gagliardi"), MD, advised Wilson to return to the emergency room, stating that Wilson appeared "very ill" and to schedule a follow-up appointment. (*Id.*).

On December 23, 2008, Wilson returned for the follow-up appointment with Gagliardi. (Tr. 371-74). Treatment notes indicate that Wilson had reported to the emergency room after a fall and had undergone a CT of her head and an x-ray of her lumbar spine. (*Id.*). According to Wilson, she had suffered from a back injury for the last fifteen years. (*Id.*). The treatment notes indicate degenerative changes in the L5-S1 of Wilson's spine. (*Id.*). Wilson reported that she was prescribed Lortab in the hospital and had previously taken only Flexeril. (*Id.*). Upon examination, Gagliardi noted abnormalities in Wilson's lumbosacral spine, especially upon palpation. (*Id.*). Gagliardi prescribed Ultram for the pain and Soma Compound for muscle relaxation. (*Id.*). Gagliardi instructed Wilson to exercise as tolerated. (*Id.*).

On February 4, 2009, Gagliardi administered a Toradol injection to Wilson's right hip. (Tr. 366). Wilson returned for another appointment with Gagliardi on February 24, 2009.

(Tr. 368-69).  During the appointment, Wilson complained of a lump in her neck.  (*Id.*).  Upon examination, Gagliardi noted no abnormalities, but noted some adenopathy and kyphosis.  (*Id.*).  On February 17, 2009, an x-ray was taken of Wilson's cervical spine.  (Tr. 357, 416).  The images demonstrated degenerative changes at C5-6, but no evidence of compression deformity or sublaxation.  (*Id.*).

On March 9, 2009, Wilson attended another appointment with Gagliardi complaining of lower back and leg pain.  (Tr. 363-64).  Wilson reported that she had fallen two weeks earlier because of weakness in her legs and had struck her right knee during the fall.  (*Id.*).  Upon examination, Gagliardi noted that Wilson's lumbosacral spine exhibited abnormalities that extended into both legs.  (*Id.*).  She prescribed Gabapentin for the pain and advised Wilson to go to the emergency room if the condition worsened.  (*Id.*).

Approximately one month later, on April 20, 2009, Wilson returned to Gagliardi with continued complaints of back and left leg pain.  (Tr. 360-62).  Gagliardi administered an injection of Toradol to Wilson's right hip and prescribed Ultram for pain.  (*Id.*).

Wilson returned to Family Health Center complaining of back pain on July 28, 2009.  (Tr. 355-56).  Wilson was seen by nurse practitioner Nancy Buthman ("Buthman").  (*Id.*).  Wilson reported that she had fallen three times in the last couple of months, complained of "clumsiness" on her left side and of muscle spasms at night, affecting her sleep.  (*Id.*).  Buthman noted no abnormalities in Wilson's knees and renewed the prescription for Ultram for pain management.  (*Id.*).  Wilson returned for another appointment with Buthman on August 26, 2009, complaining of continued back pain.  (Tr. 348-49).  Buthman again prescribed Ultram for pain.  (*Id.*).  During an October 21, 2009 visit, at Wilson's request, Buthman discontinued Ultram and prescribed Naprosyn and Flexeril for pain management.  (Tr. 343-44).

### 2. St. James Mercy Hospital

Treatment notes indicate that Wilson went to the emergency room at St. James Mercy Hospital on December 28, 2009, complaining of chronic back pain, knee pain, left shoulder pain and migraine headaches. (Tr. 337-39). Wilson reported that she uses a cane to ambulate, had recently relocated from Florida, and did not have a local physician. (*Id.*). Wilson was given a prescription for Diclofenac and advised to contact Elaine Burritt to establish a primary care provider. (*Id.*).

### 3. Spencer P. Annabel, MD and Elaine C. Burritt, NP

Treatment notes indicate that Wilson commenced treatment with Spencer P. Annabel ("Annabel"), MD, and his nurse practitioner, Elaine C. Burritt ("Burritt") on January 11, 2010. (Tr. 324-27). During the first appointment, Wilson explained that she had recently relocated to New York in November 2009, after leaving an abusive relationship in Florida. (*Id.*). Wilson had been referred to Annabel's care after an emergency room visit on December 28, 2009. (*Id.*). Wilson reported her medical history, including uncontrolled hypertension, a lumbar disc herniation in 1992, chronic low back pain with muscle spasms since 1992, insulin-dependent diabetes, a pre-2006 history of cocaine use, potential seizure disorder since 2008, bipolar disorder with schizophrenia, tendencies to paranoia, panic attacks with blackouts and post-traumatic stress disorder ("PTSD"). (*Id.*). Wilson reported that she had been without her medications since leaving Florida in November 2009 and that she was receiving mental health treatment at Steuben County Mental Health. (*Id.*).

The notes indicate that Wilson had previously reported to the emergency room complaining of chronic headaches, knee pain and shoulder pain. (*Id.*). Wilson reported that she previously had a disc herniation in her back and had undergone surgery to correct it. (*Id.*).

Despite the surgery, Wilson reported that she continued to experience back spasms, along with pain in her knees and chronic ankle swelling. (*Id.*). Burritt noted that Wilson walked with a cane, had a broad-based gait and sat "guarded" in her chair with frequent position changes. (*Id.*).

Burritt formulated a treatment plan for Wilson's hypertension, hyperlipidemia, metabolic syndrome, and diabetes. (*Id.*). With respect to her back pain, Burritt noted that Wilson described significant muscle spasms and suspected that Wilson suffered from degenerative arthritis in her back. (*Id.*). Burritt advised Wilson that she did not want to prescribe narcotics or controlled substances to control her pain and instead prescribed Robaxin and suggested Tylenol if needed. (*Id.*).

On January 13, 2010, an x-ray was taken of Wilson's lumbosacral spine. (Tr. 329). This image did not demonstrate any vertebral compression, destruction or osteopenia. (*Id.*). The images did reveal chronic degenerative disc disease at L5-S1 with prominent anterior spurs from the inferior end-plate of L5, but no significant disc space narrowing. (*Id.*).

On January 27, 2010, Wilson attended a follow-up appointment with Burritt. (Tr. 320-23). Wilson reported that she continued to experience chronic pain, but reported some relief in her muscle spasms as a result of the Robaxin. (*Id.*). Burritt monitored Wilson's diabetes, hypertriglyceridemia and hypertension-related health issues. (*Id.*). On February 16, 2010, Wilson returned for another appointment with Burritt. (Tr. 316-19). During the appointment, Burritt monitored Wilson's compliance with prescribed treatment for her various medical impairments. (*Id.*). Wilson reported increasing knee pain and pain in her neck. (*Id.*). According to Burritt, Wilson appeared uncomfortable and shifted in her chair frequently. (*Id.*). Wilson complained that she was unable to do much walking due to the continued pain in her legs and back. (*Id.*). Burritt opined that Wilson's back pain appeared to be arthritic in origin and

prescribed a trial of Mobic.  (*Id.*).  Burritt stressed, and Wilson agreed, that she needed to avoid using opiates to manage her chronic pain.  (*Id.*).

On May 7, 2010, Wilson attended another appointment with Burritt.  (Tr. 548-52).  During the appointment, Wilson complained of headaches and back pain.  (*Id.*).  Burritt observed that Wilson appeared uncomfortable and shifted in her chair frequently.  (*Id.*).  According to Burritt, the symptoms described by Wilson were characteristic of a migraine, and Burritt prescribed Atenolol and Maxal and instructed Wilson to call if she did not improve.  (*Id.*).  Treatment notes indicate that Wilson was being treated for tuberculosis by Dr. Picco.  (*Id.*).  Wilson informed Burritt that she had been advised to apply for disability based upon her physical and mental impairments, but hoped to be able to train for sedentary employment that would permit her frequent positional changes to accommodate her musculoskeletal disease.  (*Id.*).

Wilson returned for an appointment with Burritt on June 14, 2010.  (Tr. 543-47).  During the appointment, Wilson complained of ongoing chronic back problems that prevented her from physical activity.  (*Id.*).  According to Wilson, she experienced difficulty sleeping due to the pain.  (*Id.*).  Burritt noted that Wilson had a long-standing history of degenerative disc disease and chronic back pain.  (*Id.*).  Burritt again observed that Wilson appeared to be in pain and that she frequently shifted in her chair.  (*Id.*).  Burritt noted that Wilson's back pain might be aggravated by her weight gain.  (*Id.*).  Due to medical issues, Burritt discontinued prescriptions for anti-inflammatory medications and advised Wilson to avoid any over-the-counter anti-inflammatories and prescribed Voltaren gel for her back pain.  (*Id.*).  At a follow-up appointment on July 27, 2010, Burritt prescribed Ryzolt for Wilson's back pain.  (Tr. 538-42).

Wilson's next documented appointment with Burritt occurred on December 17, 2010.  (Tr. 606-10).  During the appointment, Wilson appeared uncomfortable and used the arm

rests on her chair in order to sit and stand. (*Id.*). Burritt noted that Wilson continued to suffer from chronic back pain and stressed the importance of low back exercises. (*Id.*). Burritt continued Wilson's prescriptions for Ryzolt and Gabepentin. (*Id.*).

On February 11, 2011, Wilson returned for an appointment with Burritt. (Tr. 611-15). During the appointment, Wilson reported significantly increased back pain, along with bilateral hip and leg pain. (*Id.*). Burritt noted that Wilson had a history of back pain after she suffered a back injury at work in 1992. (*Id.*). According to Burritt, Wilson's last x-ray revealed degenerative disease. (*Id.*). Burritt suggested that the increased back pain might be weather-related because Wilson suffered from degenerative arthritis in her back; she suggested that Wilson undergo an MRI. (*Id.*).

### 4.    **Pasquale Picco, MD**

Treatment records indicate that Wilson was treated for tuberculosis by Pasquale Picco ("Picco"), MD, between January 28, 2010 and June 17, 2010. (Tr. 524-35). Picco prescribed Isoniazid and monitored Wilson's progress. (*Id.*).

### B.    **Mental Health Treatment Records**

### 1.    **Lee Mental Health**

Wilson received mental health treatment at Lee Mental Health between 2007 and 2009. (Tr. 478-98). On May 23, 2007, Wilson was taken to the hospital after she exhibited strange behavior while working at a convenience store. (Tr. 478-79). Wilson reported that she felt disoriented and started imagining things, such as maggots in her bed, being pregnant and being blind. (*Id.*). She got down on the floor and barked at customers. (*Id.*). Wilson reported that she was aware of her odd behavior and eventually requested assistance from police officers. (*Id.*). At the Ruth Cooper Center, she appeared alert and oriented, and her urine screen was

negative for narcotics.  (*Id.*).  Wilson reported that she previously had used cocaine, but that she had been sober for eight months.  (*Id.*).  She was diagnosed with anxiety disorder, not otherwise specified, rule out panic disorder, cocaine dependence, uncertain remission and assessed a Global Assessment of Functioning ("GAF") of 65.  (*Id.*).  Wilson was discharged with instructions to follow-up with Lee Mental Health Center.  (*Id.*).

On August 11, 2008, Wilson was evaluated for treatment at the Lee Mental Health Center.  (Tr. 480).  Wilson reported that she had recently been discharged from inpatient treatment and that she continued to suffer from excessive worry, aggressive and violent behavior, lapses in memory and paranoia.  (*Id.*).  Wilson reported prior cocaine use to alleviate her mental symptoms and that she had been physically and sexually abused as a child.  (*Id.*).  Wilson also reported that she experienced command auditory hallucinations.  (*Id.*).  According to Wilson, she had conversations with the voices that she heard.  (*Id.*).  Wilson also reported that she had "shut down" after the deaths of two of her children and her mother and that she did not talk for a long time.  (*Id.*).

Treatment notes indicate that Wilson was admitted to the Lee Mental Health Center Crisis Stabilization Unit into inpatient treatment between October 9, 2008 and October 12, 2008 for homicidal ideation against her live-in boyfriend.  (Tr. 481-84).  Upon admission she was diagnosed with adjustment disorder, but at discharge was diagnosed with PTSD and cocaine dependence.  (*Id.*).  Wilson reported a history of auditory hallucinations, violent tantrums, mood swings, insomnia, poor concentration and racing thoughts.  (*Id.*).  During her stay, Wilson participated in therapeutic activities and reported improved mood.  (*Id.*).  Wilson was not placed on psychotropic mediations.  (*Id.*).  She was assessed a GAF of 65 and discharged with instructions to follow-up with the Lee Mental Health Center.  (*Id.*).

On October 22, 2008, Wilson attended an appointment with Vinod Bhandari ("Bhandari"), MD, who diagnosed Wilson with bipolar disorder, not otherwise specified, cocaine dependence versus cocaine abuse, in remission, rule out PTSD, and assessed a GAF of 55.  (*Id.*). She was assessed to have a classic history of bipolar disorder of mild to moderate severity. Bahandari prescribed Trileptal.  (*Id.*).

On January 8, 2009, Wilson attended an appointment with Christopher Healey ("Healey"), MD.  (Tr. 497-98).  Healey opined that Wilson's mental status was normal and that she was in a "very entangled relationship" with an abusive boyfriend.  (*Id.*).  Wilson did not have any acute symptoms of psychosis, mania, hypomania or delirium, although she exhibited some depressive symptoms and appeared more irritable than sad.  (*Id.*).  Healey assessed a GAF of 55 and recommended that she continue to receive mental health treatment from a consistent provider.  (*Id.*).

Wilson continued to receive mental health treatment at the Center between December 2008 and September 2009.  (Tr. 485-96).  During treatment, Wilson reported that she had moved and was no longer living with her ex-boyfriend.  (*Id.*).  Wilson slept on the couch or floor at friends' houses.  (*Id.*).  Wilson also reported that she had begun using a cane to ambulate due to her back pain.  (*Id.*).  Wilson was prescribed Prozac and Abilify.  (*Id.*).  At one point during the treatment, Wilson reported that she had gotten into a physical altercation with her roommate and that her daughter provided her food.  (*Id.*).  During her treatment sessions, Wilson continued to complain of troubled sleep, anxiety and back pain, but reported that her medications were helping to keep her "even."  (*Id.*).

2.      **Steuben County Mental Health Clinic**

On November 19, 2009, Wilson attended an intake appointment at the Steuben County Mental Health Clinic ("SCMHC"). (Tr. 420-29). During the appointment, Wilson underwent a comprehensive mental health assessment administered by Teri Pitbladdo. (*Id.*). Wilson reported that she had recently relocated from Florida after leaving an abusive relationship and that she was staying with friends. (*Id.*). Wilson reportedly did not have all of her medications and complained of difficulty sleeping, poor appetite and weight loss. (*Id.*). Wilson reported experiencing blackouts, violent tendencies and prior inpatient hospitalizations. (*Id.*). Wilson reported a history of cocaine use in 1987 through 1989 and again between 2004 and 2007. (*Id.*). Wilson reported that she had been enrolled in special education classes in school and that she was unable to work due to physical limitations, including her reliance on a cane to ambulate. (*Id.*).

Pitbladdo noted that Wilson presented with depressed mood, constricted to flat affect, compromised insight and judgment due to past substance abuse, domestic violence, mental illness and loss of energy, but normal thought processes without evidence of delusions or hallucinations. (*Id.*). Pitbladdo recommended mental health treatment and a consultation with the clinic doctor. (*Id.*).

On December 24, 2009, Wilson continued her mental health intake screening during an appointment with C.M. DeSocio-Burns ("DeSocio-Burns"), LCSW-R. (Tr. 430-37). Wilson presented with a depressed and tearful mood and walked unsteadily with a cane. (*Id.*). She reported that she was living with family and that her daughter was going to move to the area once Wilson settled in her own apartment. (*Id.*). Wilson reported a history of auditory and visual hallucinations and blackouts. (*Id.*). Wilson was diagnosed with bipolar disorder,

depressive disorder with psychotic features, PTSD, cocaine dependence, adjustment disorder with mixed anxiety and personality disorder, not otherwise specified.  (*Id.*).

Between January 2010 and April 2011, Wilson received ongoing mental health treatment at SCMHC.  (Tr. 438-51, 553-95, 622-32).  During that time, Wilson routinely attended therapy sessions with DeSocio-Burns and received medication management and psychiatric monitoring from nurse practitioner, Ellen T. Stephens ("Stephens"), NP.  (*Id.*).  Initially, Wilson presented with a depressed mood and frequently complained of trouble sleeping and back pain, particularly during periods of prolonged sitting or standing.  (*Id.*).  Wilson reported a history of temper tantrums.  (*Id.*).  On January 22, 2010, Stephens assessed a GAF of 65 and prescribed Prozac, Vistaril and Abilify.  (Tr. 440).  Wilson repeatedly complained of depressed moods, troubled sleeping and paranoid thoughts.  (*Id.*).

In February 2010, Wilson's daughter relocated to the area, which improved Wilson's mood, although she continued to experience problems sleeping.  (Tr. 447).  According to Wilson, she planned to live in an apartment with her daughter.  (*Id.*).  In March 2010, Wilson reported that she continued to have difficulties sleeping and that her daughter was helping to care for her.  (Tr. 448).  She reported a history of engaging in violent behavior and violent criminal acts during her twenties.  (*Id.*).  Wilson reported that her depression seemed controlled and agreed to try Trazodone to assist with sleep.  (*Id.*).

Wilson missed several appointments in March and April 2010 and was discharged from treatment.  (Tr. 559-63).  In May 2010, Wilson was re-assessed for treatment through two intake appointments.  (Tr. 564-84).  Wilson reported that she had missed her appointments because she did not have the finances for transportation to the appointments and did not have a phone.  (Tr. 565).  Wilson reported that she continued to experience depression, mood swings

and feelings of hopelessness.  (*Id.*).  In addition, Wilson reported visual and auditory

hallucinations.  (Tr. 572).  According to Wilson she saw "death all around [her], skeletons and

such and voices that say 'kill, kill, kill.'"  (Tr. 575).  She also reported thoughts of not wanting to

live anymore and feelings of violent compulsions towards her landlord.  (Tr. 565).  Wilson

scored a 78 on a ZUNG assessment, indicating "severe to extreme depression."  (*Id.*).  Wilson

reported that she continued to take her prescribed medications.  (*Id.*).  Wilson was assessed to

have a GAF of 55-60.  (Tr. 566).

Wilson reported that she had been attending church.  (Tr. 570).  In addition,

Wilson reported that she was not getting along with her landlord.  (Tr. 575).  Wilson reported

that her daughter had decided not to stay in the area and was going to move to Ohio.  (*Id.*).

According to Wilson, her oldest daughter lived in Maryland, and Wilson was planning to visit

her at the end of June and perhaps move there permanently.  (*Id.*).

DeSocio-Burns completed a Criteria for Severe and Persistent Mental Illness form

regarding Wilson.  (Tr. 583-84).  DeSocio-Burns opined that Wilson suffered from marked

difficulties in maintaining social functioning and frequent deficiencies of concentration,

persistence or pace resulting in a failure to complete tasks in a timely manner in work, home or

school settings.  (*Id.*).  DeSocio-Burns indicated that Wilson's GAF was 50 or less over the past

twelve months on a continuous or intermittent basis.  (*Id.*).  Wilson was re-admitted to treatment

at SCMHC.  (Tr. 581).

Wilson continued treatment with DeSocio-Burns and Stephens.  (Tr. 585-95).  In

June 2010, Wilson continued to experience depression and chronic pain.  (Tr. 585).  Wilson

reported that her physician had required her to discontinue her pain medication in order to obtain

lab-work from Wilson.  (*Id.*).  Wilson reported that the pain negatively affected her mood,

causing mood swings.  (*Id.*).  Wilson reported that on Father's Day, she and her roommate had

invited some friends for a picnic.  (*Id.*).  Wilson returned for treatment in July, continuing to

suffer from depressed mood and tearfulness.  (Tr. 587).  She again complained of back pain and

indicated that she had not been able to restart her pain medication.  (*Id.*).  Wilson reported that

her daughter had found a house in Maryland and that she would be moving to Maryland to live

with her daughter.  (*Id.*).  According to Wilson, she planned to go to Maryland initially for a

three-month period and move there permanently if the relocation went well.  (*Id.*).

       In August, September and October 2010, Wilson attended appointments and

reported a generally euthymic mood, but continued chronic pain.  (Tr. 591-95).  Wilson reported

that she had been socializing more with friends.  (Tr. 591).  Wilson reported that she was

planning to visit her daughter for Thanksgiving and return before Christmas.  (Tr. 593).  Wilson

stated that she would likely move if she were successful in obtaining SSI.  (*Id.*).  Wilson reported

that she had been visiting friends and attending church, but that she still did not like to be around

many people, stating that she experienced social anxiety in groups.  (*Id.*).

       In December 2010, Wilson attended appointments at SCMHC demonstrating a

tearful, depressed mood.  (Tr. 622).  Wilson reported that she had traveled to Maryland to visit

her pregnant daughter and that while there her daughter had lost the full-term baby due to heart

problems.  (*Id.*).  Wilson indicated that she no longer wished to relocate to Maryland.  (*Id.*).  In

January 2011, Wilson attended an appointment with a dysthymic mood and complaining of

problems sleeping.  (Tr. 623).  According to Wilson, she was experiencing disturbing dreams

about her past.  (*Id.*).

       In February 2011, Wilson reported that she was planning to move out of her

apartment because her roommate becomes verbally abusive when drinking.  (Tr. 624).  Wilson

reported that she continued to go to church and that other members of the church were helping

her find a new apartment.  (*Id.*).  Stephens opined that Wilson appeared motivated and more

stable than she had during her last visit.  (*Id.*).  In March 2011, Wilson presented with a euthymic

mood and reported that she had been assaulted by her roommate two days earlier.  (Tr. 628).

Wilson reported that she called the police and moved out of the apartment the following day.

(*Id.*).  Wilson was staying with a female church friend.  (*Id.*).  Wilson reported trouble sleeping.

(*Id.*).

On March 28, 2011, Wilson attended another appointment with DeSocio-Burns.

(Tr. 630).  During the appointment, Wilson demonstrated a dysthymic, tearful mood.  (*Id.*).

Wilson reported that she continued to live with her friend, which she found difficult, and

sometimes stayed at her brother's house.  (*Id.*).  According to Wilson, she slept well on some

nights and poorly on others.  (*Id.*).

### C.    **Medical Opinion Evidence**

### 1.    **Harbinder Toor, MD**

On April 1, 2010, state examiner Harbinder Toor ("Toor"), MD, conducted a

consultative internal medicine examination of Wilson.  (Tr. 514-18).  Wilson reported chronic

pain stemming from arthritis in her back, hips and knees.  (*Id.*).  In addition, Wilson reported her

pain was sharp and constant, and caused difficulty standing, walking, squatting, sitting, bending

and lifting.  (*Id.*).  Wilson reported difficulties with balance and a tendency to fall, particularly

because her left knee "gives out."  (*Id.*).

Wilson also reported chronic pain in her neck that radiated to her left shoulder.

(*Id.*). According to Wilson she suffered from arthritis in her neck.  (*Id.*).  Wilson also reported a

history of migraine headaches, which she experiences several times each week.  (*Id.*).  According

to Wilson, the migraines cause nausea and sensitivity to light and noise.  (*Id.*).  Wilson also reported experiencing a seizure in 2008.  (*Id.*).

Wilson reported that she is able to maintain her personal hygiene, cook daily, clean and do laundry weekly and shop monthly.  (*Id.*).  According to Wilson, she does not clean, care for children or socialize.  (*Id.*).  Wilson reported that she enjoys reading, watching television and spending time with her daughter.  (*Id.*).

Upon examination, Toor noted that Wilson demonstrated moderate pain in the back, hips and knees and that she used a prescribed cane for ambulation.  (*Id.*).  Her gait was abnormal with limping towards the left side, with and without the cane.  (*Id.*).  Wilson declined to walk on her heels and toes or to squat due to pain.  (*Id.*).  Toor assessed that Wilson's station was normal, but noted that she was unable to stand for more than a few minutes without the cane.  (*Id.*).  The report indicates that, because of pain and imbalance, Wilson had a medical need for the cane in order to stand and walk.  (*Id.*).  Toor noted that Wilson declined to lie down on the examination table and that she needed no assistance changing for the examination.  (*Id.*).  Toor also noted that Wilson could rise from the chair, but with difficulty.  (*Id.*).

Toor noted that Wilson's cervical and lumbar spine showed forward flexion to twenty degrees, extension zero degrees, lateral flexion twenty degrees bilaterally and rotary movements twenty degrees bilaterally.  (*Id.*).  Toor noted pain in Wilson's neck, but no cervical or paracervical pain or spasm or trigger points.  (*Id.*).  Toor noted pain in Wilson's lumbar back, and an absence of SI joint or sciatic notch tenderness, spasm, scoliosis, kyphosis or trigger points.  (*Id.*).  Wilson declined to perform the straight leg raise in both the sitting and supine positions.  (*Id.*).

Wilson declined movements of her hips due to pain. (*Id.*). Her left knee flexion and extension were 140 degrees, and she had full range of motion in her right knee. (*Id.*). Toor noted slight tenderness and swelling in both knees, although it was more pronounced on the left knee. (*Id.*). Toor observed full range of motion in her ankles bilaterally, and strength was five out of five in her proximal and distal muscles bilaterally. (*Id.*). With respect to her lower extremities, Toor did not observe any sensory abnormality, joint effusion, instability or muscle atrophy. (*Id.*). With respect to Wilson's upper extremities, Toor noted pain in her left shoulder with forward elevation and abduction ninety degrees and full range adduction, internal and external rotation. (*Id.*). Toor found full range of motion in Wilson's right shoulder and in her elbows, forearms, wrists and fingers bilaterally. (*Id.*). Toor noted that Wilson had strength of five out of five in her upper extremities and that her hand and finger dexterity was in intact. (*Id.*). Toor reviewed the results of an April 6, 2010 x-ray of Wilson's lumbar spine which revealed no acute bony abnormality. (*Id.*).

Toor diagnosed Wilson with a history of arthritic pain in the back, knees and hips, history of moderate obesity, history of balance problems, history of pain in her neck radiating to the left shoulder, history of migraine headache, history of hypertension, history of diabetes and a seizure in 2008. (*Id.*). He opined that Wilson had moderate to severe limitations in standing, walking, squatting, bending and lifting, and a moderate limitation in sitting for "a long time" because of pain in multiple joints. (*Id.*). He also assessed a moderate limitations in pushing, pulling and reaching because of pain in the left shoulder. (*Id.*). Additionally, he assessed a mild to moderate limitations in twisting, bending and extending of the neck spine because of pain in the neck. (*Id.*). According to Toor, Wilson's migraine headache from neck pain can interfere

with her routine.  (*Id.*).  Toor noted that no other medical limitations were suggested by his evaluation.  (*Id.*).

### 2.    Annabel's Opinions

On May 7, 2010, Annabel completed a medical statement regarding Wilson's back impairment.  (Tr. 520).  According to Annabel, Wilson suffered from chronic, nonradicular pain and weakness.  (*Id.*).  He opined that Wilson's pain was severe and that she could only stand for fifteen minutes at a time, sit for thirty minutes at a time, occasionally and frequently lift up to five pounds at a time, occasionally bend and never stoop.  (*Id.*).

On that same date, Annabel completed a medical statement regarding Wilson's knee problems.  (Tr. 521).  According to Annabel, Wilson suffered from chronic pain, swelling and tenderness, as well as instability in both knees.  (*Id.*).  Additionally, Annabel opined that Wilson suffered from chronic stiffness in her left knee.  (*Id.*).  Annabel opined that Wilson's impairments caused her moderate pain and noted that she was unable to work.  (*Id.*).  Annabel opined that Wilson could stand and sit for fifteen minutes at a time, frequently and occasionally lift up to five pounds, occasionally bend, stoop, balance and climb stairs, but could never climb a ladder.  (*Id.*).

Annabel also completed a medical statement regarding Wilson's migraine headaches.  (Tr. 522).  According to Annabel, Wilson suffered from migraine headaches which caused nausea, vomiting and sensitivity to noise.  (*Id.*).  Annabel opined that the headaches occurred several times each week and lasted several days.  (*Id.*).  According to Annabel, Wilson was not able to work during a headache.  (*Id.*).

On December 17, 2010, Annabel completed a physical Residual Function Capacity ("RFC") assessment of Wilson.  (Tr. 602, 618).  According to Annabel, Wilson was

able to sit for two hours, stand for one hour and walk for one hour during an eight-hour workday. (*Id.*). Annabel opined that Wilson could occasionally carry and lift up to ten pounds, but could never carry or lift more than that. (*Id.*). In addition, Annabel opined that Wilson could occasionally squat, but could never bend, crawl or climb. (*Id.*). Wilson did not identify any grasping, pushing, pulling or fine manipulation limitations. (*Id.*).

On March 8, 2011, Annabel completed a medical statement regarding Wilson's diabetes. (Tr. 617). Annabel indicated that Wilson suffered from Type II, insulin resistant diabetes characterized by neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station and nephropathy. (*Id.*). Annabel opined that as a result of multiple chronic medical problems, Wilson was not able to work and that she could stand for fifteen minutes at a time, sit for thirty minutes at a time, occasionally and frequently lift up to five pounds and occasionally balance. (*Id.*).

### 3.   <u>Christine Ransom, PhD</u>

On April 1, 2010, state examiner Christine Ransom ("Ransom"), PhD, conducted a consultative psychiatric evaluation of Wilson. (Tr. 509-13). Wilson reported that her landlord had driven her to the examination, a distance of approximately sixty miles. (*Id.*). Wilson reported that she had completed high school in a regular class setting and had not worked since 2007 due to back and leg pain. (*Id.*). Wilson reported that she had previously been employed as a certified nursing assistant, cashier, security guard and short order cook. (*Id.*).

According to Wilson, she had been hospitalized on four prior occasions for bipolar disorder with psychotic features. (*Id.*). Wilson reported that she received outpatient treatment in Florida and was currently receiving counseling and medication management at

Cornell Mental Health.  (*Id.*).  Wilson reported nightmares, flashbacks and intrusive thoughts.

(*Id.*).  According to Wilson she has difficulty sleeping, decreased appetite and frequently cries

for no reason.  (*Id.*).  Wilson reported low energy, but described previous periods of excessive

energy.  (*Id.*).  According to Wilson, she experiences difficulty concentrating due to racing

thoughts.  (*Id.*).

   Wilson reported no desire to socialize, but noted that people from her church visit

her house.  (*Id.*).  Wilson reported that she communicates with her family over the phone, reads a

lot and "spends a little bit of time walking."  (*Id.*).  Wilson denied suffering from generalized

anxiety, panic attacks, manic symptomatology, thought disorder or any cognitive symptoms or

deficits.  (*Id.*).  Wilson also reported a history of substance abuse, but that she had been sober

since 2007.  (*Id.*).

   Wilson reported that she was able to care for her personal hygiene and could only

perform light cooking, cleaning, laundry and shopping due to back and hip pain and arthritis in

her knees.  (*Id.*).  Wilson reported that she could manage money and that she relies on friends or

medical transport for transportation.  (*Id.*).  Wilson reported that she did not like to socialize and

that she spent her time taking short walks, reading and performing light household chores.  (*Id.*).

   Upon examination, Ransom noted that Wilson was cooperative, but withdrawn

and preoccupied with internal stimuli, possibly voices or visual hallucinations.  (*Id.*).  According

to Ransom, Wilson appeared to be looking at something out of the corner of her eye and

sometimes to be thinking about things other than what was occurring in the examination room.

(*Id.*).  Ransom noted that Wilson was neatly and casually dressed and groomed, with adequate

hygiene.  (*Id.*).  Ransom opined that Wilson had fluent and intelligible speech, although

moderately irritable and pressured; demonstrated lack of coherent and goal-directed thought

processes, with evidence of hallucination, delusion or paranoia in the examination setting; had a

moderately irritable and pressured affect; appeared withdrawn as if responding to something that

she was hearing or seeing in the room; and, demonstrated clear sensorium, full orientation, good

insight and average intellectual functioning with an appropriate general fund of information.

(*Id.*).  Ransom noted that Wilson's judgment was fair to good because although she was taking

her medication, she did not appear to understand all of the symptoms of her mental illness and

was not able to report her disorganized thinking or hallucinations.  (*Id.*).  Ransom noted that

Wilson's attention and concentration were moderately to markedly impaired.  (*Id.*).  According

to Ransom, Wilson could count backwards from ten, perform one out of three calculations, and

had difficulties with the serials threes.  (*Id.*).  Ransom opined that Wilson's difficulty appeared to

result from her mood disturbance and thought disorder.  (*Id.*).  Ransom found Wilson's

immediate memory skills were moderately impaired.  (*Id.*).  According to Ransom, Wilson could

recall one out of three objects immediately, one out of three objects after five minutes and could

complete three digits forward and two digits backwards.  (*Id.*).  Again, Ransom opined that

Wilson's memory difficulties appeared to stem from her mood disturbance and thought disorder.

(*Id.*).

        Ransom diagnosed Wilson with PTSD, currently moderate, bipolar disorder,

depressed phase with psychotic features, currently moderate to marked, and drug and alcohol

dependence in remission.  (*Id.*).  According to Ransom, Wilson would have moderate difficulty

following and understanding simple directions and instructions, performing simple tasks

independently, maintaining attention and concentration for simple tasks, maintaining a simple

regular schedule and learning simple new tasks.  (*Id.*).  Ransom also opined that Wilson would

have moderate to marked difficulty performing complex tasks, relating adequately with others

and appropriately dealing with stress due to her mental impairments.  (*Id.*).  Ransom

recommended that Wilson continue mental health treatment with medication management and

opined that her prognosis was "fair to good with continued treatment."  (*Id.*).

### 4.     L. Meade, Psychology

On April 12, 2010, agency medical consultant Dr. L. Meade ("Meade")

completed a Psychiatric Review Technique.  (Tr. 452-64).  Meade concluded that Wilson's

mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Meade,

Wilson suffered from no limitations in her activities of daily living and moderate limitations in

her ability to maintain social functioning and to maintain concentration, persistence or pace.

(*Id.*).  In addition, according to Meade, there was insufficient evidence to determine whether

Wilson had suffered from repeated episodes of deterioration.  (*Id.*).  Meade completed a mental

RFC assessment.  (Tr. 466-70).  Meade opined that Wilson suffered from moderate limitations in

her ability to understand, remember and carry out detailed instructions, accept instructions and

respond appropriately to criticism from supervisors, and respond appropriately to changes in the

work setting.  (*Id.*).  According to Meade, Wilson might have some reduced tolerance for stress

and working in close proximity to others.  (*Id.*).  Meade opined that Wilson could tolerate the

stressors in a low-level workplace and could understand and follow simple job instructions with

adequate attention and concentration, make simple decisions and relate adequately with

supervisors and coworkers.  (*Id.*).

### 5.     DeSocio-Burns's Opinions

On December 27, 2010, DeSocio-Burns completed a medical source statement

regarding Wilson's mental ability to do work-related activities.  (Tr. 597-98).  DeSocio-Burns

opined that Wilson had no limitations in her ability to understand, remember and carry out

simple instructions, had moderate limitations in her ability to make judgments on simple

work-related instructions and had extreme limitations in her ability to understand, remember and

carry out complex instructions and make judgments on complex work-related instructions.  (*Id.*).

According to DeSocio-Burns, Wilson had moderate to marked limitations in her ability to

interact appropriately with the public, supervisors and coworkers and a marked limitation in her

ability to respond appropriately to usual work situations and changes in routine work setting.

(*Id.*).

 On that same date, DeSocio-Burns completed a medical statement concerning

Wilson's mental impairments.  (Tr. 599).  She opined that Wilson exhibited anhedonia, or

pervasive loss of interest in almost all activities, agitation, decreased energy, difficulty

concentrating or thinking, hallucinations, delusions or paranoid thinking, generalized persistent

anxiety, motor tension, apprehensive expectations, and vigilance.  (*Id.*).  DeSocio-Burns opined

that Wilson suffered from mild limitations in activities of daily living and moderate to marked

limitations in maintaining social functioning.  (*Id.*).  In addition, DeSocio-Burns indicated that

Wilson had deficiencies in maintaining concentration, persistence or pace and had experienced

repeated episodes of deterioration.  (*Id.*).  According to DeSocio-Burns, Wilson was unable to

function outside of her home during panic attacks.  (*Id.*).

 DeSocio-Burns also completed a mental RFC assessment regarding Wilson.

(Tr. 600-01).  According to DeSocio-Burns, Wilson's ability to follow work rules, use judgment,

interact with supervisors and function independently was fair to poor.  (*Id.*).  She rated as poor to

none Wilson's abilities to relate to coworkers, deal with the public, deal with work stress,

maintain attention and concentration, understand and remember complex or detailed instructions,

behave in an emotionally stable manner, relate predictably in social situations and demonstrate

reliability.  (*Id.*).  According to DeSocio-Burns, Wilson's ability to understand, remember and

carry out simple instructions was good to fair and her ability to maintain personal appearance

was not limited.  (*Id.*).  DeSocio-Burns opined that Wilson constantly suffered from depression

severe enough to interfere with her attention and concentration and often suffered from

depression severe enough to interfere with her sleep.  (*Id.*).  According to DeSocio-Burns,

Wilson's depression produced good days and bad days and her mental impairments likely would

cause her to be absent from work more than four days a month.  (*Id.*).


III.    **Non-Medical Evidence**

    In her application for benefits, Wilson reported that she was born in 1966.

(Tr. 192).  Wilson reported that she had completed high school in a regular class setting and had

previously been employed as a cashier, certified nursing assistant, cook, housekeeper and a

security guard.  (Tr. 223).  According to Wilson, she was last employed as a cook in a restaurant

and stopped working due to her medical conditions.  (Tr. 222-23).

    Wilson reported that she lived in an apartment with her landlord.  (Tr. 244-54).

According to Wilson, she spends her days in her apartment, either walking around, lying in bed

or sitting in her chair.  (*Id.*).  She also attends doctor's appointments and prepares simple meals.

(*Id.*).  Wilson reported that her medical conditions affect her sleep and that she takes medications

to aid her sleep.  (*Id.*).  Wilson reported that she could generally care for her personal hygiene,

although she sometimes needed assistance tying her shoes.  (*Id.*).  Wilson reported that she

prepares simple meals for herself and that her landlord did most of the household chores and

helped her carry laundry and groceries.  (*Id.*).

Wilson reported that she leaves the house approximately twice a week and uses public transportation, accepts rides from friends or walks to her destinations. (*Id.*). According to Wilson, her driver's license was revoked because she experienced seizures and uncontrollable shaking spasms. (*Id.*). Wilson reported that she goes shopping for household items approximately twice a month for no longer than an hour at a time. (*Id.*).

According to Wilson, she used to attend church, but no longer goes because she becomes stiff and uncomfortable during services. (*Id.*). Wilson enjoys reading, watching television, listening to the radio, talking with friends and playing cards. (*Id.*). Wilson reported that she does not always deal well with other people and does not socialize with coworkers when at work. (*Id.*).

Wilson reported difficulties lifting, standing, sitting, climbing stairs, kneeling, squatting and reaching due to pain in her back, shoulder, knees and hips. (*Id.*). Wilson reported that she uses a cane to ambulate. (*Id.*). According to Wilson, the cane was not prescribed by a doctor, but she was told that she could get one for balance. (*Id.*). Wilson uses the cane for long walks, walking uphill or on uneven ground. (*Id.*). Wilson estimated that she could walk approximately six yards before needing to rest for approximately five minutes. (*Id.*).

According to Wilson, she had difficulty with attention because her mind wanders. (*Id.*). Wilson reported that she can generally complete tasks, although it might take a while and that although she can follow written instructions, she sometimes cannot follow verbal instructions. (*Id.*). Wilson reported that she did not have problems interacting with people in positions of authority, but tended to keep to herself. (*Id.*). Wilson reported that she had previously lost jobs due to difficulties getting along with coworkers and that she had difficulty dealing with stress or changes in her schedule. (*Id.*).

According to Wilson, she experiences pain in her back, hips, knees and legs, which has increased in intensity since 2007. (*Id.*). Wilson reported experiencing daily pain, which is aggravated by walking, sitting and bending. (*Id.*). Wilson reported that her pain medication was ineffective in managing her pain and caused her to be drowsy and dizzy. (*Id.*). Wilson reported that she suffers from headaches every three to four days. (Tr. 240-41). According to Wilson, she was advised to take Excedrin, but it was ineffective in providing complete relief. (*Id.*).

During the administrative hearing, Wilson testified that she had completed the twelfth grade in a regular class room setting and had obtained her nursing assistant's certificate in 1990. (Tr. 70). Wilson reported that she previously used cocaine beginning in 2004 or 2005 and that she stopped working in 2006. (Tr. 71). Wilson testified that she was homeless for a number of years and stayed with various friends during that time. (Tr. 71-72).

With respect to her back pain, Wilson testified that she had difficulty getting out of bed and showering due to the pain. (Tr. 73). Wilson testified that the pain radiated to her left leg, often causing her to fall. (*Id.*). Wilson testified that her doctor was attempting to diagnose her back problem and had suggested nerve blocks to alleviate the pain. (Tr. 73-74). Wilson reported that she also experienced pain in her neck and hips. (Tr. 74-75). In addition, Wilson reported ongoing arthritic pain in her knees. (Tr. 76).

According to Wilson, she experiences pain daily and constantly struggles to perform routine tasks. (*Id.*). Wilson has to sit while cooking and frequently microwaves her meals. (Tr. 75-76). In addition, Wilson testified that she can only walk short distances at a slow pace with breaks. (Tr. 77). Wilson also testified that she suffers from headaches that last

approximately four days.  (*Id.*).  According to Wilson, when she suffers a headache, she often is

unable to do anything and frequently cries or covers her head.  (Tr. 78).

Wilson also testified to ongoing mental health impairments, including depression,

hallucinations, schizophrenia and paranoia.  (Tr. 79-83).  According to Wilson, she has been

diagnosed with schizophrenia and bipolar disorder and at times is both suicidal and homicidal.

(Tr. 73).  Wilson testified that she hear voices and sees things, causing her fear and anxiety.

(Tr. 80).  Wilson explained that she had difficulty being around other people.  (*Id.*).  She also

reported difficulty sleeping.  (*Id.*).  Wilson experiences significant mood swings, sometimes

during the course of a single day.  (Tr. 81, 90).  According to Wilson, she has been involved in

violent interactions, including an incident during which she fired a gun at someone.  (Tr. 81-82).

Wilson reported that sometimes she feels like she wants to give up on life, or feels exceedingly

angry, while at other times she feels happy.  (Tr. 90).

## DISCUSSION

I.   **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ

must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982) (*per curiam*).  The five steps are:

> (1)    whether the claimant is currently engaged in substantial gainful activity;
>
> (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";
>
> (3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).


## II.    <u>The ALJ's Decision</u>

        In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 65-75).  Under step one of the process, the ALJ found that Wilson has not

engaged in substantial gainful activity since December 13, 2008.  (Tr. 16).  At step two, the ALJ

concluded that Wilson has the severe impairments of anxiety (variously characterized),

depression (variously characterized) and obesity.  (*Id.*).  With respect to Wilson's mental

impairments, the ALJ concluded Wilson suffers from mild difficulties performing activities of daily living and in social functioning and moderate difficulties maintaining concentration, persistence and pace.  (Tr. 17).

The ALJ found Wilson's remaining impairments, including knee pain, neck and hip arthritis, and low back pain were not severe.  (Tr. 18-19).  With respect to Wilson's alleged knee impairment, the ALJ rejected Annabel's May 7, 2010 opinion that Wilson suffered from chronic, nonradicular knee pain and weakness because his treatment notes did not contain any evaluations or clinical findings regarding Wilson's knees.  (*Id.*).  In addition, the ALJ gave limited weight to the slight, positive findings of Toor upon his examination of Wilson's knees. (*Id.*).  With respect to Wilson's claimed neck and hip arthritis, the ALJ noted that the absence of any diagnosis of arthritis or evidence that Wilson received treatment for her neck or hips.  (*Id.*). Additionally, the ALJ gave limited weight to the positive musculoskeletal findings observed by Toor on the grounds that they had not been reproduced in any other examinations.  (*Id.*). Regarding Wilson's back pain, the ALJ discounted her complaints, indicated that her complaints were episodic and that her treatment was routine.  (Tr. 19).  Additionally, the ALJ noted that an April 1, 2010 x-ray demonstrated no acute bony abnormality.  (*Id.*).  The ALJ gave little weight to Annabel's March 8, 2011 opinion that Wilson suffered from neuropathy because Annabel's treatment notes repeatedly indicated that Wilson did not suffer from neurological symptoms and concluded that his opinion was not supported by the medical records.  (*Id.*).  The ALJ concluded that Wilson had failed to establish that she had a "severe" lumbar spine impairment.  (*Id.*).

III.   __Analysis__

An individual's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

I conclude that the ALJ's RFC assessment is not supported by substantial evidence and was the product of legal error.  With respect to the Wilson's physical limitations, I conclude that the ALJ erred at step two by concluding that Wilson's spine impairment was not severe and that the ALJ's physical RFC assessment is not supported by any medical opinion of record, warranting remand.  With respect to the ALJ's mental RFC assessment, on remand, the ALJ should consider providing a more thorough explanation for discounting DeSocio-Burns's opinion.

As an initial matter, I conclude that the ALJ erred at step two when he determined that Wilson's spine impairment was not severe.   At step two of the evaluation, the ALJ must determine whether the claimant has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. 404.1520 (a)(4)(ii),

(c).  "An impairment or combination of impairments is 'not severe' when medical and other

evidence establishes only a slight abnormality or a combination of slight abnormalities that

would have at most a minimal effect on an individual's ability to perform basic work activities."

*Jeffords v. Astrue*, 2012 WL 3860800, *3 (W.D.N.Y. 2012) (quoting *Ahern v. Astrue*, 2011 WL

1113534, *8 (E.D.N.Y. 2011)); *see also Schifano v. Astrue*, 2013 WL 2898058, *3 (W.D.N.Y.

2013) ("[a]n impairment is severe if it causes more than a *de minimis* limitation to a claimant's

physical or mental ability to do basic work activities").  The Second Circuit has held that the

step-two severity test "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54

F.3d 1019, 1030 (2d Cir. 1995).

To be severe, an impairment must "significantly limit [the claimant's] physical or

mental ability to do basic work activities," such as

(1)  physical functions such as walking, standing, sitting, lifting, pushing,
     pulling, reaching, carrying or handling;

(2)  capacities for seeing, hearing and speaking;

(3)  understanding, carrying out, and remembering simple
     instructions;

(4)  use of judgment;

(5)  responding appropriately to supervision, coworkers and usual work
     situations; and

(6)  dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521, 416.921.  The impairment must also either "have lasted or be expected to

last for a continuous period of at least 12 months" or be expected to result in death.  20 C.F.R.

§§ 404.1509, 416.909.  The claimant bears the burden to present medical evidence establishing

severity.  *Whiteside v. Colvin*, 2014 WL 585303, *4 (W.D.N.Y. 2014).

I conclude that Wilson provided sufficient medical evidence to establish that she suffered from a severe impairment to her spine. As described in detail above, medical records demonstrate that Wilson complained of back pain as early as 2006 and began treatment for back pain in 2008. An x-ray of her lumbar spine in 2008 demonstrated degenerative changes at L5-S1 and an examination demonstrated abnormalities in Wilson's spine, particularly upon palpation. (Tr. 371-74). In 2009, Wilson received injections for complaints of back and leg pain and was prescribed several different medications to alleviate her pain. (Tr. 343-44, 355-56, 360-69). Additionally, an x-ray of Wilson's cervical spine also revealed degenerative changes. (Tr. 357, 416).

Throughout 2010 Wilson reported ongoing back problems to Burritt, who prescribed a variety of medications to alleviate her symptoms. A January 13, 2010 x-ray revealed "chronic degenerative disc disease at L5-S1 with prominent anterior spurs from the inferior end-plate of L5 but no significant disc space narrowing." (Tr. 329). Burritt opined on several occasions that Wilson's back pain appeared to be arthritic in origin. (Tr. 316-19, 324-27, 611-15). Further, Toor's examination was positive for limited range of motion in Wilson's cervical and lumbar spine, with pain in her neck and back. Although an April 2010 x-ray reviewed by Toor did not demonstrate any bony abnormalities, Toor opined that Wilson suffered from limitations due to her spine impairment.

The ALJ reached his step two conclusion based upon the relatively conservative treatment administered to Wilson, including the fact that she had not been referred to an orthopedist or neurologist for treatment, his mistaken conclusion that Wilson's physicians in Florida did not obtain any diagnostic images of her spine and the April 2010 image of Wilson's

spine showing no bony abnormality.[4]  (Tr. 19).  Despite the characterization of Wilson's

treatment as conservative, the record establishes that over a period of several years she received

ongoing treatment and evaluation of her spine impairments, and diagnostic images of her spine

demonstrate degeneration.  Her treatment included pain management and injections.  Further,

both Burritt and Toor noted that Wilson suffered from limited range of motion in her spine.

(Tr. 516-17, 609).  I conclude that there is sufficient evidence demonstrating that Wilson's spine

impairment was severe.  *See Burdick v. Comm'r of Soc. Sec.*, 2014 WL 2533548, *7 (D. Vt.

2014) ("there is sufficient evidence demonstrating that [claimant's] shoulder impairment was

'severe,' i.e., had 'more than a minimal effect on [claimant's] . . . ability . . . to perform basic

work activities'") (quoting SSR 85-28, 1985 WL 56856, *3 (1985)).

       An error at step two may be harmless if the ALJ identifies other severe

impairments at step two, proceeds through the remainder of the sequential evaluation process and

specifically considers the "nonsevere" impairment during subsequent steps of the process.  *See*

*Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013).  In this case, however, I cannot

conclude that the ALJ's step two error was harmless because his decision does not make clear

which physical impairments,[5] if any, he considered in the remaining steps.  In any event, even if

the step two error was harmless, the ALJ erred in his physical RFC assessment because he

rejected all of the medical opinions of record pertaining to Wilson's physical capabilities, leaving

his assessment unsupported by any medical opinion.

---

    [4]  In reaching his conclusion, the ALJ also rejected Annabel's March 8, 2011 opinion that Wilson suffered from neuropathy on the grounds that the assessment was inconsistent with Annabel's treatment notes.  I note that the March 8, 2011 opinion from Annabel concerned her alleged diabetes-related neuropathy and, thus, is seemingly irrelevant to Wilson's spine impairment.  (Tr. 617).

    [5]  It is clear that the ALJ considered some physical impairments during the remaining steps because his RFC reflects some physical limitations.  However, the Court cannot discern which of Wilson's physical impairments were considered or which produced the limitations identified by the ALJ.

In his decision, the ALJ accorded "little weight" to Annabel's opinions on the grounds that they were not consistent with the medical evidence of record, including Annabel's treatment notes.  (Tr. 23).  The government argues that Annabel was entitled to limited weight for the additional reason that Wilson primarily received treatment from Burritt, not Annabel. (Docket # 12-1).  The ALJ discounted the opinion of Toor on the grounds that Toor apparently "ignored the fact that the lumbar spine x-ray he obtained was negative for any abnormality." (Tr. 23).  In addition, the ALJ reasoned that Toor's physical examination results had not been duplicated in the record.  Neither of these reasons is persuasive because Toor's report explicitly reveals that he considered the x-ray results (which are attached to his report) and because Burritt also found some range of motion limitations.  The government also contends that Toor's opinion is properly discounted on the grounds that it is vague[6] and that Wilson refused to perform certain parts of the examination, including the heel and toe walk, squatting, lying on the examination table, moving her hips and the straight leg raise.

I need not reach the issue of whether the ALJ properly discounted the opinions of Annabel and Toor because I conclude that even assuming he did, the ALJ's rejection of the opinions created an evidentiary gap in the record requiring remand.  *Suide v. Astrue*, 371 F. App'x 684, 689-90 (7th Cir. 2010) ("it is not the ALJ's evaluation of [the treating physician's] reports that requires a remand in this case[;] . . . it is the evidentiary deficit left by the ALJ's rejection of his reports – not the decision itself – that is troubling"); *see House v. Astrue*, 2013 WL 422058, *4 (N.D.N.Y. 2013) (ALJ's proper rejection of treating physician opinion

---

[6]  With respect to the government vagueness argument, the Court notes that the government has frequently advocated the contrary position in other cases pending before the Court.  In any event, "the use of phrases such as 'moderate' or 'mild' by a consultative examiner does not automatically render the opinion impermissibly vague." *Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014).

nonetheless necessitated remand because absence of any other medical assessment created evidentiary gap).

"[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.) (internal quotation omitted), *report and recommendation adopted*, 2010 WL 4703591 (W.D.N.Y. 2010). Accordingly, although the RFC determination is an issue reserved for the Commissioner, "[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities," as a general rule, the Commissioner "may not make the connection himself." *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (internal quotation omitted). Although under certain circumstances, particularly where the medical evidence shows relatively minor physical impairment, "an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment," *House v. Astrue*, 2013 WL 422058 at *4 (internal quotation omitted), I conclude that those circumstances are not present here.

Without the opinions, the record lacks any opinion from any medical source assessing Wilson's physical limitations. Although there are many treatment notes in the record, they generally contain bare medical findings and do not address or illuminate how Wilson's impairments affect her physical ability to perform work-related functions. After discounting the opinions, the ALJ determined that Wilson retained the physical RFC to perform the full range of light work. (Tr. 21). As discussed above, it is unclear how the ALJ arrived at this RFC or which impairments he considered in formulating his assessment. Under these circumstances, I conclude that the ALJ's physical RFC assessment is not supported by substantial evidence. *See*

*Suide v. Astrue*, 371 F. App'x at 690 ("[w]hen an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion, . . . and she is not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record") (internal quotations and citations omitted); *House*, 2013 WL 422058 at *4 ("[b]ecause there is no medical source opinion supporting the ALJ's finding that [plaintiff] can perform sedentary work, the court concludes that the ALJ's RFC determination is without substantial support in the record and remand for further administrative proceedings is appropriate"); *Dailey v. Astrue*, 2010 WL 4703599 at *11 ("[w]ithout this additional medical evidence[,] [the ALJ], as a layperson, could not bridge the gap between plaintiff's [impairments] and the functional limitations that flow from these impairments"); *Walker v. Astrue*, 2010 WL 2629832, *7 (W.D.N.Y.) (same), *report and recommendation adopted*, 2010 WL 2629821 (W.D.N.Y. 2010); *Lawton v. Astrue*, 2009 WL 2867905, *16 (N.D.N.Y. 2009) ("[t]he record in this [case] contains no assessment from a treating source quantifying plaintiff's physical capabilities, and thus there is no basis upon which the court can find that substantial evidence supports the ALJ's light work RFC determination"); *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d at 913 ("a remand is necessary to obtain a proper medical source opinion to support the ALJ's residual functional capacity finding").

"As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . , to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *See Gross v. Astrue*, 2014 WL 1806779, *18 (W.D.N.Y. 2014) (quoting *Deskin*, 605 F. Supp. 2d at 912). Accordingly, I conclude that remand is appropriate to allow the ALJ to obtain a physical RFC assessment or

medical source statement from an acceptable medical source concerning Wilson's physical capabilities.

On remand, the ALJ should consider providing a more thorough explanation of his reasons for rejecting the opinion of Wilson's social worker, DeSocio-Burns, in favor of the opinion provided by the non-examining psychologist, Meade. "An ALJ is not required to give controlling weight to a social worker's opinion; although he is not entitled to disregard it altogether, he may use his discretion to determine the appropriate weight." *Cordero v. Astrue*, 2013 WL 3879727, *3 (S.D.N.Y. 2013); *Jones v. Astrue*, 2012 WL 1605566, *5 (N.D.N.Y.) ("the Second Circuit has held that 'the ALJ has discretion to determine the appropriate weight to accord the [other source's] opinion based on all the evidence before him") (quoting *Diaz v. Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995)), *report and recommendation adopted*, 2012 WL 1605593 (N.D.N.Y. 2012). Thus, "[w]hile the ALJ was free to conclude that the opinion of a licensed social worker was not entitled to any weight, the ALJ had to explain that decision." *See Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010); *see Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199-200 (2d Cir. 2010) (remanding for further proceedings where the ALJ failed "adequately to explain his determination not to credit the opinion of . . . plaintiff's treating physician"[;] . . . the ALJ's incantatory repetition of the words 'substantial evidence' gives us no indication at all of why he chose to credit the opinions of the consulting physicians over that of [the treating physician]").

In his decision, the ALJ the gave "little weight" to the opinions of DeSocio-Burns on the grounds that the limitations that she assessed were not consistent with her treatment notes, including the GAF ratings contained in the treatment records. (Tr. 23). The ALJ, however, neither described DeSocio-Burns's opinions, nor explained how they were inconsistent with the

record.  Having already concluded that this matter should be remanded for further development

of the record the ALJ should consider providing a more thorough discussion of DeSocio-Burns's

opinions and his reasons for affording them little weight.  *See Melendez v. Astrue*, 2010 WL

199266, *4 (S.D.N.Y. 2010) (remanding for further proceedings and "leav[ing] it to the ALJ on

remand to determine whether given the evidence in the record and the issues raised on this

appeal it may be prudent to address the issue of [p]laintiff's obesity").


### CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the

pleadings **(Docket # 12)** is **DENIED**.  This matter is remanded pursuant to 42 U.S.C. § 405(g),

sentence four, to the Commissioner for further administrative proceedings consistent with this

decision.

**IT IS SO ORDERED.**


<u>                                        *s/Marian W. Payson*                                        </u>
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
       March 6, 2015